# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jed A. Fisher, having been duly sworn according to law, state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and assigned to the Philadelphia Division, Fort Washington Resident Agency, Pennsylvania, and I have been employed as an FBI Special Agent since March of 2017.

2. As a Special Agent with the FBI, my duties include the investigation of international and domestic terrorism, money laundering, and fraud, including tax fraud and health care fraud. As a Special Agent, I have participated in the execution of numerous search and arrest warrants, pursuant to which I have seized evidence of plans to conduct and/or participate in fraud-related activity. I have conducted physical and electronic surveillance, debriefed confidential sources, analyzed information obtained from court-authorized pen register and trap and trace intercepts, and participated in the drafting and execution of search and arrest warrants involving these matters.

3. I am the case agent assigned to a criminal investigation of those involved in a fraudulent scheme under which individuals obtained Pennsylvania Commercial Driver's Licenses without taking the Pennsylvania Commercial Driver's License ("CDL") examination.

4. The information set forth below is either known to me personally, or was related to me by other law enforcement personnel. As this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during this investigation.

5. For the reasons stated below, there is probable cause to believe that VLADIMIR TSYMBALENKO (hereafter "TSYMBALENKO") conspired with others to commit federal program bribery (18 U.S.C. § 666(a)(1)(B)), in violation of 18 U.S.C. § 371, and conspired with others to commit

wire fraud (18 U.S.C. § 1343), in violation of 18 U.S.C. § 1349, all within the Eastern District of Pennsylvania, and submit this affidavit in support of a warrant for his arrest.

6. I base this affidavit on my personal investigation and information obtained by other FBI agents, as well as law enforcement partners with the United States Department of Transportation, Office of the Inspector General ("DOT-OIG") and Pennsylvania State Police ("PSP").

## STATUTES

7. Title 18, United States Code, Section 371, makes it a crime to conspire to violate Section 666(a)(1)(B), which, in turn, makes it a crime to

8. Title 18, United States Code, Section 1349, makes it a crime to conspire to violate Section 1343, which, in turn, makes it a crime to

## BACKGROUND

7. TSYMBALENKO owned and operated a Commercial Driver's License ("CDL") training school ("CDL School A") in Philadelphia, Pennsylvania. In exchange for a fee, TSYMBALENKO provided clients with training necessary to achieve a passing score on a Pennsylvania state-mandated CDL driving skills examination.

8. During the course of this investigation, I learned that a person is eligible to attempt a CDL driving skills examination in Pennsylvania after obtaining a valid CDL permit from their state of residency.

9. In Pennsylvania, CDL driving skills examinations are administered by: (a) employees with the Pennsylvania Department of Transportation ("PennDOT") with examinations administered at PennDOT driver's license centers; or (b) Certified CDL Third-Party Examiners who are commercially employed persons certified to conduct CDL examinations on behalf of PennDOT. PennDOT examiners

and Third-Party Examiners are both considered to be Pennsylvania CDL examiners and, as such, are agents of PennDOT.

10. PennDOT is a Pennsylvania state agency which receives benefits in excess of $10,000 in any one year period under a federal program involving a grant, contract, program, subsidy, loan guarantee, insurance, or other form of federal assistance.

11. Examinations by Third-Party Examiners are administered at private testing facilities in Pennsylvania. The Third-Party Examiners electronically input and/or upload CDL examination data, to include scheduling and examination results, into a commercial database known as the Commercial Skills Testing Information Management System ("CSTIMS").

12. Computer servers utilized to store CSTIMS data are physically located in both Virginia and Illinois. Data entered by a CDL examiner in Pennsylvania is transmitted across state lines via the internet to CSTIMS servers located in Virginia and Illinois. In turn, respective state department of motor vehicles agencies communicate with CSTIMS' servers to determine if a CDL candidate has satisfied the requirements necessary to be issued a lawful CDL.

13. The Berks Career and Technical Center ("BCTC"), in Leesport, PA, is a Pennsylvania accredited third-party CDL school and examination center.

14. During the course of this investigation, I learned from cooperating witnesses that TSYMBALENKO charged clients of CDL School A, on average, between $1,700 and $2,000 for CDL training. This fee is consistent with the practices of other CDL training facilities in the Philadelphia area. However, I also learned from those witnesses that TSYMBALENKO provided clients with an alternative to legitimately passing a CDL exam to obtain a CDL. For a cost of approximately double the normal rate, TSYMBALENKO arranged for a student to receive a passing score, which was entered into CSTIMS, without actually taking the CDL driving skills examination.

15.     An individual who obtains a CDL is able to obtain more lucrative employment as a commercial driver and, therefore, a Pennsylvania CDL has a value of $5,000 or more.

## THE CONSPIRACY

### Information from Cooperating Witness 1

16.     In January 2019, a cooperating witness ("CW1")[1] described a criminal scheme through which clients of TYSMBALENKO's CDL training school, CDL School A, were able to obtain their Pennsylvania CDLs without taking the actual CDL examination.

17.     According to CW1, as part of the scheme, TYSMBALENKO scheduled a number of his clients to take CDL exams at BCTC on the same date. On paper, another cooperating witness (CW2)[2], who was a third-party CDL examiner employed by BCTC, was listed as the examiner. CW2 did not test all of TSYMBALENKO's clients scheduled for that date and, thus, some of TSYMBALENKO's clients were granted passing scores without completing any form of testing.

18.     Prior to testing, TSYMBALENKO's clients sent their personal identifying information to TSYMBALENKO's cellular phone via text message, and TSYMBALENKO electronically forwarded the client information to CW2.

---

[1] In 2019, CW1 entered a guilty plea, pursuant to a cooperation plea agreement with the government, to conspiracy and multiple counts of access device fraud and aggravated identity theft in the Eastern District of Pennsylvania. CW1 was sentenced on July 1, 2020. The Government requested a sentence below the sentencing guidelines and mandatory sentence for the aggravated identity theft counts and CW1 was sentenced to a term of 16 months imprisonment, a sentence below the Sentencing Guidelines and mandatory sentence for those offenses.

[2] In 2021, CW2 entered a guilty plea, pursuant to a cooperation plea agreement with the government, to conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349; and bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B). Under the terms of the plea agreement, the government will request a sentence below the sentencing guidelines based on CW2's substantial assistance in the investigation and prosecution of other individuals.

19. CW2 used TSYMBALENKO's client information to create a registry in the CSTIMS database for each of TSYMBALENKO's clients. This allowed CW2 to schedule a CDL exam for TSYMBALENKO's clients, and then later enter results of a Pennsylvania CDL road examination into the CSTIMS database for each of them. CW2 affirmed that he conducted road examinations for each of TSYMBALENKO's clients.[3]

## PennDOT Audit of BCTC

20. In the fall of 2018, PennDOT conducted both an overt and covert audit of BCTC. The audit identified irregularities in BCTC's CDL examination program, including a finding that BCTC's CDL examination passing rate was over 90%, a rate significantly higher than the state average passing rate.

## PennDOT Interview of CW2

21. In November 2018, PennDOT representatives interviewed CW2. During that interview, CW2 said he used pre-signed CDL examination score sheets. The score sheets were pre-signed by R.C., a BCTC CDL program supervisor and Pennsylvania certified CDL third-party examiner, to create paper records falsely reflecting that individuals passed CDL examinations conducted by R.C.[4] An examiner's signature on a scoring sheet is an attestation that the signatory personally conducted the CDL examination. CW2's use of the score sheets pre-signed by R.C. allowed CW2 to circumvent the CSTIMS system default rules which limited CDL examiners to scheduling and/or conduct five complete examinations per day. [5] By using the score sheets pre-signed by R.C., CW2 was able to fraudulently

---

[3] Data in the CSTIMS database is transmitted to, or retrieved by, individual state Departments of Motor Vehicles.

[4] On November 19th, 2021, R.C. was charged by information in the U.S. District Court for the Eastern District of Pennsylvania to twelve counts of wire fraud in connection with this scheme and other criminal activity.

[5] This limitation on number of tests allowed to be administered on any one day is set by PennDOT, as reflected in that the CSTIMS system only allows five complete exams to be evaluated and/or scheduled for one day. If more than five full exams are scheduled or evaluated, PennDOT receives a notification which may trigger an overt or covert audit. As a practical matter, PennDOT assesses that each full exam requires approximately two hours to complete, and each exam must be conducted during daylight hours.

enter up to ten passing examination scores per day instead of his daily limit of five examinations.

## FBI and DOT-OIG Investigation

22. In February 2019 and March 2021, I interviewed CW2. During these interviews, CW2 admitted to accepting multiple cash payments from TSYMBALENKO between 2015 and October 2018, totaling more than $10,000, in exchange for giving TSYMBALENKO's clients passing scores on CDL examinations during that time frame. CW2 admitted that he did not properly test some of Co-Conspirator 1's clients and, in some cases, did not test TSYMBALENKO's clients at all, but he entered passing scores for those clients into CSTIMS, thus authorizing TSYMBALENKO's clients to receive their CDL. According to CW2, he participated in this fraudulent activity with TSYMBALENKO from approximately 2015 through September 2018.

23. CW2 estimated he received more than fifty separate cash payments from TSYMBALENKO. The payments ranged between $200 and $300. The payments were for CW2 to pass TSYMBALENKO's clients regardless of the clients' actual driving abilities. During my investigation, I reviewed CW2's checking account activity during the period of time in which he accepted cash from TSYMBALENKO. I observed that CW2 deposited more than $10,000 in cash into his checking account during this time. During one of CW2's aforementioned interviews, CW2 told me that neither he nor his wife (with whom CW2 shares the checking account) had any other substantial contemporaneous income, and CW2admitted that those cash deposits into his checking account were almost entirely from TSYMBALENKO.

24.     CW2 admitted that he falsely generated passing CDL examination scores, at TSYMBALENKO's direction, for TSYMBALENKO's clients who had not taken any portion of the CDL examination. CW2 stated that he electronically uploaded these false scores into the CSTIMS database creating a chain of events that ultimately led to the issuance, on the part of multiple states, of lawful CDLs for TSYMBALENKO's clients.

29.     I learned from a confidential witness ("CW3"),[6] who regularly assisted TSYMBALENKO between approximately 2018 and 2019, that TSYMBALENKO was a heavy drinker and was often too intoxicated to physically type text messages on his phone.  According to CW3, TSYMBALENKO dictated information to CW3 and CW3 texted messages on TSYMBALENKO's behalf using TSYMBALENKO's cellular phone.  CW3 texted messages to CW2 and others to arrange CDL examinations for TSYMBALENKO's clients.  In addition, CW3 communicated with clients, at TSYMBALENKO's direction, and informed clients of the fees that TSYMBALENKO charged to guarantee a CDL -- $3,500.00 for a vehicle with an automatic transmission and $4,500.00 for a vehicle with manual transmission.

30.     On July 16, 2019, FBI agents executed a search warrant at CDL School A, TSYMBALENKO's business in Philadelphia, PA.  Among other items, FBI agents seized business records, including contracts between TSYMBALENKO and his clients and receipts for fees associated with TSYMBALENKO's services.

31.     During this investigation, I reviewed records obtained from BCTC, including time and attendance sheets and payroll records for CW2 and R.C.  I also reviewed PennDOT records and CSTIMS records of all examinations conducted at BCTC while CW2 and R.C. were employed there. The PennDOT records include information which was uploaded by CW2 and R.C. into CSTIMS.

---

[6] CW3 is a relative by marriage of CW1 and cooperated in this investigation to further CW1's cooperation.  As a result of his cooperation, CW3 obtained deferred action from deportation on September 14, 2021.

Specifically, the PennDOT and CSTIMS data includes the dates and times of reported CDL exams, the names of the examiner and examinee, the duration of the reported examination, the commercial vehicle utilized during the reported exam, and a reported pass or failure status for each examinee.

32. A comparison of the BCTC data against the CSTIMS and PennDOT data corroborates information I learned from other sources during this investigation, including the following:

    a. <u>March 10, 2018.</u>

        (1) CW2's signed timesheets show he was not present at work on March 5, 2018.

        (2) From my review of CSTIMS login information, I know that CW2 logged into the CSTIMS system at 12:17 p.m. on March 5, 2018 for a brief session.

        (3) My review of TSYMBALENKO's telephone records shows that TSYMBALENKO sent five text messages to CW2 from 2:32 p.m. to 2:41 p.m. on March 5, 2018.

        (4) From CSTIMS login information, I know that CW2 logged into CSTIMS on March 7, 2018 at 5:40 a.m. and scheduled five exams to be performed by him and five exams to be performed by R.C. on Saturday, March 10, 2018.

        (5) From my review of BCTC records, including signed time sheets, I know that R.C. was scheduled off on Saturday, March 10, 2018 and did not work on that date.

        (6) PennDOT and CSTIMS data reflect that all 10 students of TSYMBALENKO's CDL School A were granted passing scores for exams allegedly conducted by both CW2 and R.C. on March 10, 2018.

        (7) CW2's signed BCTC timesheet for Saturday, March 10, 2018 indicates he was present for work at BCTC from 6:00 a.m. until 4:00 p.m.

(8) CSTIMS records reflect that CW2 and R.C. allegedly conducted simultaneous road tests of two individuals, U.S. and L.S., on March 10, 2018, beginning at 4:00 p.m., using the same vehicle, Pennsylvania tag AG34839, which was registered to TSYMBALENKO.

(9) CW2's signed BCTC timesheet reflects that his workday ended at 4:00 p.m. on March 10, 2018, but PennDOT records reflect that CW2's road test exam for L.S. did not end until 4:30 p.m.

(10) On Sunday March 11, 2018, CW2 logged into CSTIMS at approximately 1:16 p.m., and uploaded 10 passing scores for the exams allegedly conducted by CW2 and R.C. on March 10, 2018, including the exams for U.S. and L.S.

(11) In reviewing L.S.'s signed score sheet, I observed that L.S. included his telephone number, ending in 6617.

(12) My review of TSYMBALENKO's cell phone records shows that, between February 22 and March 2, 2018, L.S. and TSYMBALENKO exchanged four text messages and two telephone calls, with one of those calls lasting 55 seconds and the other lasting 43 seconds.

(13) My review of CSTIMS data shows that CW2 logged into the system on March 10, 2018 at 2:39 p.m. and input passing scores for four other CDL exams. The passing scores were for four men from New York and were for exams that were allegedly conducted by CW2 on March 9, 2018, a day that BCTC records show that CW2 did not work. CW2's fraudulent passing scores resulted in the issuance of New York CDLs for the four men.

   b. <u>February 16, 2018.</u>

   (1) On February 13, 2018, TSYMBALENKO and CW2 exchanged more than 20 text messages.

   (2) At approximately 11:52 a.m., CW2 logged into the CSTIMS system and scheduled two exams to be conducted by R.C. and five exams to be conducted by him on February 16, 2018.

   (3) My review of BCTC's signed time sheets shows that neither CW2 nor R.C. were present for work on February 16, 2018.

   (4) On February 19, 2018 at approximately 5:02 a.m., CW2 logged into the CSTIMS system and falsely input passing scores for seven individuals allegedly tested by him and R.C. on February 16, 2018.

   (5) Additionally, my review of PennDOT records shows that CW2 and R.C. allegedly conducted examinations at the same time, using the same commercial vehicle PA tag AG54616, which was owned by TSYMBALENKO.

  33. My review of records seized from Co-Conspirator-1's business on July 16, 2019, pursuant to the execution of a search warrant, shows, among other things, a receipt for $1,700, dated April 25, 2018 from F.A. for "CDL Training."

   a. My review of TSYMBALENKO's telephone records showed that TSYMBALENKO and CW2 exchanged over a dozen text messages and a minute-long telephone call on May 13, 2020.

   b. My review of CSTIMS data showed that, on May 14, 2018, at 5:14 a.m., CW2 logged into the system and scheduled an exam for F.A. for May 17, 2018, with CW2 as the scheduled examiner.

   c. My review of BCTC records showed that, according to CW2's hand-written and signed time sheets, CW2 did not work on May 17, 2018.

   d. My review of CSTIMS data also showed that, on May 20, 2018, CW2 accessed the CSTIMS database and posted fraudulent passing scores for F.A. for a CDL exam which allegedly occurred on May 17, 2020 in TSYMBALENKO's commercial truck, Pennsylvania tag AG54616, with CW2 as the examiner.

   e. As a result of the fraudulent passing scores, F.A.'s home state of New Jersey issued a CDL to F.A.

  34. Wherefore, based on my training, experience, and knowledge of this investigation, I have probable cause to believe, and do so believe that, CW2, as an agent of PennDOT:
(a) corruptly accepted and agreed to accept cash, totaling more than $10,000, from VLADIMIR TSYMBALENKO, intending to be influenced or rewarded in connection with the issuance of Pennsylvania CDLs to TSYMBALENKO's clients, with those CDLs each having a value of $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B); and (b) conspired with TSYMBALENKO to commit wire fraud, througgh the submission of fraudulent CDL examination information, via wire, to CSTIMS in violation of 18 U.S.C. § 1349. I therefore request that a warrant be issued for VLADIMIR TSYMBALENKO's arrest.

                 Respectfully submitted,

                  /s Jed. A. Fisher
                  JED A. FISHER
                  Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me
on January 28, 2022:

/s Honorable Richard A. Lloret
HONORABLE RICHARD A. LLORET
UNITED STATES MAGISTRATE JUDGE